UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                                          CASE NO. 16-10661

WHISTLER ENERGY II, LLC                         SECTION "B"

    DEBTOR                              CHAPTER 11

*************************************************************************

H. KENNETH LEFOLDT, JR., TRUSTEE

    PLAINTIFF

VERSUS                                          ADV.P. NO. 18-1028

BAKER HUGHES OILFIELD OPERATIONS, LLC

    DEFENDANT

## **<u>MEMORANDUM OPINION</u>**

This matter came before the court on the motion filed by H. Kenneth Lefoldt, Jr., Trustee of the Whistler Energy II, LLC Litigation Trust ("Trustee") asking the court to grant summary judgment to the Trustee on his complaint to recover property of the estate under 11 U.S.C. § 547. For the reasons set forth below, the motion is granted in part and denied in part. Because the Trustee has shown that he is entitled to summary judgment on whether the debtor had an interest in the property transferred, §§ 547(b)(1), (b)(2), (b)(4), and (b)(5), as well as the defenses claimed by Baker Hughes as to new value under § 547(c)(1), and the subjective ordinary course of business under § 547(c)(2)(A), the court grants summary judgment as to those portions of the Trustee's complaint. There is a genuine issue of material fact as to whether the debtor was insolvent as of the date of the transfer pursuant to § 547(b)(3), and as to the objective ordinary

1

course of business defense under § 547(c)(2)(B), so summary judgment is denied as to those parts of the motion.

## I.  Procedural History and Jurisdiction

The Trustee filed his complaint in this matter seeking to recover $968,017.16 that the debtor paid to Baker Hughes during the 90 days preceding the filing of the bankruptcy petition. Baker Hughes filed an answer with a demand for a jury trial as well as a motion to withdraw the reference of this case.[1]  During the course of a hearing on a discovery motion, Baker Hughes asserted that in addition to the other defenses that it was raising to the Trustee's claim, it did not agree that the debtor was insolvent at the time of the transfer. Because there were two other similar adversary proceedings pending before the court at that time in which the defendants had also contested insolvency of the debtor, the court determined that it would conduct a bench trial as to the insolvency question, so as to only have to make that determination one time, and to reduce the chances of inconsistent results.  The trustee then filed a motion for summary judgment (P-51) as to the other parts of his complaint, which was heard on December 5, 2018.  The matter was taken under advisement by the court.  After that hearing, the defendants in the other adversary proceedings decided that they would not contest the insolvency of the debtor after all, so the bench trial was cancelled.  The Trustee then filed a supplemental motion for summary judgment (P-93) to address the insolvency issue, the parties in this matter then submitted additional briefing on the insolvency portion of their arguments, and the entire matter was taken under advisement.  Because Baker Hughes does not consent to the jurisdiction of this court and

---

[1] Baker Hughes filed a total of three motions to withdraw the reference, all of which have been denied.  The district court directed this court to conduct the pre-trial proceedings in this case, including ruling on the motion for summary judgment (R.Doc. 107).

has requested a jury trial and withdrawal of the reference of this matter.  To the extent this court does not have jurisdiction over this matter, the court's ruling constitutes proposed findings of fact and conclusions of law.[2]

### A.  Objections

Both Baker Hughes and the Trustee have raised numerous objections to the other side's exhibits and expert witnesses.  The court overrules all objections raised by both parties.

### II.    Summary Judgment

The standard for granting a motion for summary judgment is that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.[3]  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L.Ed.2d 202, 212 (1986).  A fact is material if it might affect the outcome of the suit under governing law.  *Anderson*, 477 U.S. 242, 248.  In reviewing a motion for summary judgment, the "court construes all facts and inferences in the light most favorable to the nonmoving party."  *Rogers v. Bromac Title Services, LLC.* 755 F.3d 347, 350 (5th Cir. 2014).

### III.    Background Facts

Both the debtor and Baker Hughes are involved in the oil and gas industry.  Baker Hughes and the debtor regularly transacted business before the filing of the involuntary petition against the debtor on March 24, 2016 ("the petition date").  Baker Hughes provided services to the

---

[2]  *Executive Benefits v. Arkison,* 134 S.Ct. 2165, 2172 (2014).
[3]  Fed.R.Civ.Pro. 56.

debtor in connection with the drilling and completion of the A5 Well located in the Green

Canyon Block 18 in the Gulf of Mexico.[4]  Specifically, Baker Hughes provided services and

equipment to the debtor.  One of the things Baker Hughes provided was a "pup joint" for the A5

Well.  It turns out that the pup joint was the wrong size, and this caused a delay of several days

in the drilling operation, which in turn caused the debtor to lose money.  The debtor withheld

payment to Baker Hughes on 14 invoices involved with the problem, and the parties attempted to

work out a resolution.[5]  Eventually the parties entered into a settlement agreement, whereby the

debtor agreed to make two payments to Baker Hughes, and Baker Hughes agreed to accept

$200,000 less that the face amount of the invoices.[6]  The two payments were made on December

15, 2015 in the amount of $968,017.15, and December 31, 2015 in the amount of $968,017.16.

The two payments resolved the problem between the parties, and the debtor did not do any more

business with Baker Hughes.  Only the December 31, 2015 payment falls within the preference

period.

## IV.    Legal Analysis

The Trustee brings his complaint under § 547(b) of the Bankruptcy Code, which provides:

> (b) Except as provided in subsections (c) and (i) of this section, the trustee may
> avoid any transfer of an interest of the debtor in property--
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such
> transfer was made;
> (3) made while the debtor was insolvent;
> (4) made--
> (A) on or within 90 days before the date of the filing of the petition; or

---

[4]   The parties entered into a Master Service Contract with the effective date of April 21, 2014, which was the agreement in effect during the relevant period.  *See* R.Doc. 60-4, Declaration of Ross Spence, Exhibit A.

[5]   The description of the problem between the debtor and Baker Hughes is paraphrased from the deposition dated January 17, 2019 of Robert E. Wichert, which is Exhibit C1 to the Baker Hughes Supplemental Response to the Trustee's Motion for Summary Judgment (R. Doc. 96), pp. 8-20 (filed under seal).

[6]   The Settlement Agreement is found at Exhibit 1 to the Trustee's Motion for Summary Judgment, (R.Doc. 51-3).

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if--
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Baker Hughes contends that the Trustee has not shown that he can prove the required elements of § 547(b).  Baker Hughes also raises defenses under § 547(c).

## A.  Section 547(b) – the elements for finding a preferential payment occurred

### 1.  An interest of the debtor in property.

Section 547(b) provides that the trustee may avoid any transfer of an interest of the debtor in property.  Baker Hughes argues that the debtor did not have an interest in the property transferred because Apollo, the senior secured creditor of the debtor, had earmarked the funds for payment to Baker Hughes, and thus, under the judicially created "earmarking doctrine," the funds were not property in which the debtor had an interest for purposes of § 547(b).

Baker Hughes alleges the following facts.  The funds used by the debtor to pay Baker Hughes came from unwinding hedges that Apollo, a lender of the debtor, had required the debtor to put in place as collateral for its loan.[7]  The debtor could not unwind the hedges absent the consent of Apollo.  Apollo gave permission to the debtor to unwind the hedges to obtain funds specifically to make the payment to Baker Hughes that the Trustee now seeks to avoid.

The argument Baker Hughes makes is that because the debtor could not unwind the hedges without the permission of Apollo, and because Apollo gave permission to the debtor to

---

[7]   The hedges were to protect the debtor (and Apollo) from any drop in the price of oil.  As part of the agreement between the debtor and Apollo, the debtor was required to keep the hedges in place unless Apollo gave permission to the debtor to unwind the hedges.

5

unwind the hedges specifically in order to pay Baker Hughes, these funds were earmarked for

payment to Baker Hughes.  But even taking all of the factual contentions made by Baker Hughes

as true, as a matter of law, it is clear that the earmarking doctrine does not apply in this case

In  *Coral Petroleum, Inc. v. Banque Paribas-London,* 797 F.2d 1351, 1356 (5th Cir.

1986), the court defined the earmarking doctrine:

> A widely accepted exception to section 547 holds that when a third person makes
> a loan to a debtor specifically to enable that debtor to satisfy the claim of a
> designated creditor, the proceeds never become part of the debtor's assets, and
> therefore no preference is created.  The exception applies whether the proceeds of
> the loan are transferred directly by the lender to the creditor or are paid to the
> debtor with the understanding that they will be paid to the creditor in satisfaction
> of the creditor's claim, so long as the proceeds are clearly "earmarked" and are, in
> fact, paid in accordance with that understanding.  Because the earmarking defense
> is a judicially created exception to the preference section, it is to be narrowly
> construed.[8]

Here, the hedges belonged to the debtor.  The debtor's funds were used to purchase the

hedges, and the hedges were part of the collateral provided by the debtor to Apollo in exchange

for the loans from Apollo.  Even though the debtor had to have Apollo's permission to unwind

the hedges, the hedges were not Apollo's property.  Apollo could not have unwound the hedges

itself, and the funds from unwinding the hedges belonged to the debtor, not Apollo.

Additionally, the hedges were collateral for Apollo's loan, not a loan from Apollo.  Allowing the

debtor to unwind the hedges was not the equivalent of making a new loan to the debtor.

In other parts of its argument, Baker Hughes makes much of the fact that Apollo had

promised to lend the debtor an additional $20 million that it did not in fact lend.  If Apollo had

lent that money with directions for the debtor to pay Baker Hughes with it, then there might be

---

[8]  *Citing* 5 COLLIER ON BANKRUPTCY ¶ 547.03[2][a] (Richard Levin & Henry J. Sommer eds., 16th ed.); *see also In re Entringer Bakeries, Inc.*, 548 F.3d 344, 348 (5th Cir. 2008).

an earmarking claim to be made.  But the funds from the hedge were the debtor's, and although

Apollo as the senior secured creditor was exercising significant control over the business

decisions and finances of the debtor, the debtor remained a separate entity with its own bank

accounts.  The funds from the hedge were deposited into the debtor's bank account, and Baker

Hughes was paid from that same bank account by the debtor.  This was not a situation such as

the one in *IFS Financial Corp.,* 669 F.3d 255 (5th Cir. 2012) where the commingling of funds,

and the finding of fraudulent activity led the court to find that an account legally titled in one

entity's name was really controlled by another entity, who sought to hide itself through a

convoluted and misleading corporate structure.  In that case, the court stated:

> Control over an account, and its contents, is central to assessing whether they are
> to form part of a bankruptcy estate.  But in this necessarily fact-based inquiry,
> control, while primary, may not always be decisive, and legal ownership is not
> irrelevant.  Where, as here, evidence of fraud and the debtor's strict control are
> both strong, disputed legal ownership is less compelling.  On the other hand,
> where evidence of fraud is weak, legal ownership might weigh heavier in our
> calculus.

Here, there is no question that Apollo and the debtor were separate entities.  A secured creditor's

monitoring of the activities of a borrower does not equal ownership or control of the borrower's

bank accounts.

Baker Hughes makes one further argument, which is interesting in light of its insistence

elsewhere that the debtor was solvent at the time the of the transfer.  Baker Hughes argues that if

the debtor was in fact insolvent at the time of the transfer, then the transfer could not be an

interest of the debtor in property because if Apollo was under-secured at the time of the transfer,

then its act of releasing its collateral to allow Baker Hughes to get paid means that there cannot

be a preference.  In support of this argument Baker Hughes cites *In re Ramba, Inc.*, 437 F.3d 457

(5th Cir. 2006). In that case, the debtor had granted a lien on all of its assets to Citibank, and owed Citibank over $25 million under a credit agreement, which was more than the fair market value of all the assets. The debtor entered into a deal to sell some, but not all, of its assets to a third party. As part of the sale, the buyer received the assets free and clear of all liens, and paid Citibank $15.6 million in satisfaction of its liens. It also, as part of the sale, assumed some of the debtor's other obligations, and another $10 million went to other creditors of the debtor. The Trustee in that case attempted to set aside the portion of the sale that paid $10 million to other creditors. The Fifth Circuit held that a trustee cannot avoid a transfer of property unless the property would have been in the estate and therefore available to the debtor's general creditors and noted that the debtor had no equitable interest in the transferred property - only bare legal title - which left nothing to convey to creditors. The court noted that if the buyer had been willing to pay a higher price for the assets, rather than assuming debt, the increase in the funds would have gone to Citibank, not the debtor's other creditors.

Here, however, the debtor's plan of reorganization specifically creates a litigation trust to pay Class 4 general unsecured claims.[9] Any proceeds the Trustee recovers from Baker Hughes will go directly into that fund. Thus, regardless of the outcome on the insolvency question, funds recovered in this and most of the other preference actions related to this bankruptcy case will benefit general unsecured creditors.

---

[9]  R.Doc. 530, Plan of Reorganization dated October 19, 2016 at pp. 25-26, Article III(B)(4) General Unsecured Claims; and pp. 40-45 Article VIII Litigation Trust.

### 2.  Section 547(b)(1), (b)(2) and (b)(4)

The first two subsections of § 547(b) require that the transfer must be to or for the benefit of a creditor, and for or on account of an antecedent debt owed by the debtor before such transfer was made.  Baker Hughes does not contest that the Trustee has satisfied § 547(b)(1).

In its motion for summary judgment, the Trustee's brief states that "the Transfer was made on account of an antecedent debt owed by the Debtor to Baker Hughes before the Transfer was made."  In the next paragraph the Trustee states:  "Therefore there is (*sic*) genuine issue of material fact as to Section 547(b)(2) of the Bankruptcy Code."  Baker Hughes notes in its brief that the Trustee stated that there is a genuine issue of material fact.  At oral argument, the Trustee informed the court that this was a typographical error, and when read in context, it is obvious that this is true.  Because Baker Hughes does not make any argument to the contrary, the court finds that the Trustee has satisfied § 547(b)(2).

The parties do not contest that the transfer was made in the 90 days prior to the filing of the involuntary bankruptcy petition.

### 3.  Section 547(b)(3)

The parties are in dispute as to whether or not the debtor was insolvent as of the date of the transfer.  The Bankruptcy Code defines "insolvent" for a corporate debtor as when its "financial condition [is] such that the sum of [its] debts is greater than all of [its] property, at a fair valuation…"[10]  As noted previously, § 547(f) of the Bankruptcy Code provides that "[f]or the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." 11 U.S.C. § 547(f).  This

---

[10]   11 U.S.C. § 101(32)(A).

"presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion." *Louis Dreyfus Natural Gas Corp. v. Herod (In re GasMark Ltd.),* 158 F.3d 312, 315 (5th Cir.1998) (quoting Fed.R.Evid. 301). In other words, the "effect of this presumption is to shift the burden to the transferee to produce evidence of the debtor's solvency as of the transfer date." *In re Ramba, Inc.,* 416 F.3d 394, 403 (5th Cir.2005) (citing *GasMark,* 158 F.3d at 315).   Here, to counter the presumption of insolvency, Baker Hughes has produced an expert report by Paul T. Gariepy, Jr., a certified public accountant who is also certified in financial forensics, with an analysis of the "fair value" of Whistler at the transfer date.[11]

The Trustee argues that Gariepy's report should be excluded under Federal Rule of Evidence 702 because it is not relevant or reliable.  *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).  Gariepy's expert report uses Whistler's balance sheet to argue that Whistler was solvent at the time of the transfer.  But, as noted above, Gariepy also includes in his report a section analyzing the "fair value" of Whistler.  Most of the Trustee's arguments go to the deficiencies of the report's methodology in arriving at the "fair value" of the debtor's assets and liabilities.  Although the court agrees with many of these critiques, this is a motion for summary judgment, and the court's place at this juncture is not as the factfinder who will determine which expert's opinion should

---

[11]   Paragraph 44 of the report (which can be found at R.Doc. 96-3) defines fair value as follows:

> Fair Value represents that price that could be obtained if the assets were sold in a prudent manner in the ordinary course of business during a reasonable period of time (but not so short as to impair the value of the assets by a forced sale, liquidation or auction), both parties having reasonable knowledge of relevant facts.

be given more weight.  Rather, the court must determine whether Baker Hughes has established that there is a genuine issue of material fact for trial, and set forth enough evidence to rebut the presumption of insolvency, such that the burden is now on the Trustee to show by a preponderance of the evidence that the debtor was insolvent as of the date of the transfers.  The court finds that Baker Hughes has made this showing, and thus, § 547(b)(3) has not been satisfied for purposes of granting summary judgment.

### 4.  Section 547(b)(5)

In its answer, Baker Hughes states that the Trustee cannot establish the element of § 547(b)(5) because Baker Hughes was a fully secured creditor pursuant to La. R.S. 9:4867, *et seq.* and 43 U.S.C. § 1333(a)(2)(A), and had Baker Hughes not received the payment, it would have filed affidavits entitling it to liens/privileges against the debtor's assets.  Baker Hughes further asserts that in a Chapter 7 liquidation, it would have received payment in full on account of its fully secured status, thus the Trustee cannot satisfy § 547(b)(5).

The Trustee disputes this, arguing that the court's order of December 29, 2016 (R.Doc. 526) granting Apollo's omnibus objection to the secured status of claims in the main bankruptcy case rendered all claims similar to Baker Hughes' claim general unsecured claims.  Baker Hughes argues that because it did not participate in the main bankruptcy case, it should not be bound by prior rulings of this court in the main bankruptcy case.

The court need not address these arguments.  If Baker Hughes had a Louisiana Oil Well Lien under LOWLA, its privilege would have attached only to the property specified in La. R.S.

9:4863.[12]  Specifically, the Baker Hughes privilege would only attach to the well site (and related

assets as set forth in the statute) at which it performed work for the debtor, i.e., the A5 Well,

which is the subject of the agreement between the debtor and Baker Hughes.  Baker Hughes, as

discussed above, was paid with funds from the debtor's bank account that the debtor received

from unwinding a hedge that constituted Apollo's collateral; these funds were not part of Baker

Hughes hypothetical collateral.  Where a partially secured creditor is paid from property not

covered by its lien or privilege, there is a preferential effect because in a Chapter 7 liquidation,

---

[12]   The statute reads:

A. Except as limited by Subsections B, C, and D of this Section, the privilege given by R.S. 9:4862 is established over:

(1) The operating interest under which the operations giving rise to the claimant's privilege are conducted together with the interest of the lessee of such interest in a:
(a) Well, building, tank, leasehold pipeline, and other construction or facility on the well site.
(b) Movable on a well site that is used in operations, other than a movable that is only transiently on the well site for repair, testing, or other temporary use.
(c) Tract of land, servitude, and lease described in R.S. 9:4861(12)(c) covering the well site of the operating interest.
(2) Drilling or other rig located at the well site of the operating interest if the rig is owned by the operator or by a contractor from whom the activities giving rise to the privilege emanate.
(3) The interest of the operator and participating lessee in hydrocarbons produced from the operating interest and the interest of a non- participating lessee in hydrocarbons produced from that part of his operating interest subject to the privilege.
(4) The proceeds received by, and the obligations owed to, a lessee from the disposition of hydrocarbons subject to the privilege.
B. The privilege that results from operations on a voluntary or compulsory unit affects only that part of a non-participating lessee's interest in the operating interest located within the boundaries of the unit and only insofar as the unit covers and affects the unitized zone or formation. The privilege affects only the interest of the non-participating lessee in the other property described in Subsection (A)(1) and (2) of this Section that is used in the operations of the unit well.
C. The privilege does not affect:
(1) That part of hydrocarbons produced from an operating interest that is owned by a lessor, sublessor, overriding royalty owner, or other person who is not a lessee of the operating interest.
(2) The obligations or proceeds arising from the disposition of such hydrocarbons that are owned by or payable to such persons.
D. The lien and privilege provided for in this Subpart shall not attach or apply to any rigs, machinery, appurtenances, appliances, equipment, or other related equipment moved onto the lease for the purpose of plugging and abandoning the well or wells and closing associated pits thereon in compliance with an order issued by the commissioner of conservation after public hearing in accordance with the provisions of R.S. 30:1 et seq.
Additionally, the lien and privilege provided for in this Subpart shall not attach or apply to any casing, tubing, pipe, and other tubular goods recovered from the drill hole as a result of such plugging and abandoning operations.

that creditor would receive a distribution for the full value of its secured claim, in addition to the payments already received.[13]

Here, Baker Hughes' own expert valued the assets upon which Baker Hughes would have had a lien had the preference payment not been made at far less than what the debtor owed. The expert report of Paul Gariepy, Jr.[14] shows a fair value, as of December 31, 2015, of the debtor's oil and gas properties as $100,078,000. The fair value of the property and equipment was $307,075. Baker Hughes certainly had no privilege against the $78,782,006 in funds escrowed for abandonment, nor did it have an interest in the other current assets of the debtor. Most of the debtor's oil and gas properties are also not subject to the Baker Hughes privilege.[15] Apollo alone was owed approximately $125.5 million when the case began (*see* R.Doc. 50, the debtor's motion for cash collateral and post-petition financing). Apollo's security for its loans was all of the debtor's assets, both those that would have secured the Baker Hughes privilege and other assets. And as shown by the order granting the objection to secured claim status (R.Doc. 526), there were several other secured creditors with privileges or liens against the same assets Baker Hughes would have had a privilege against.[16]

---

[13] 5 COLLIER ON BANKRUPTCY ¶ 547.03[7] (Richard Levin & Henry J. Sommer eds., 16th ed.) (*citing* Countryman, *The Concept of a Voidable Preference in Bankruptcy*, 38 Vand. L. Rev. 713 (1985)).

[14] Exhibit A2 to Baker Hughes' Supplemental Response, (R.Doc. 96-3).

[15] Baker Hughes performed work on the A5 Well, located in Green Canyon Block 18. The debtor also has Green Canyon Blocks 19 and 60, as well as Ewing Banks Blocks 944/988, all of which are the subject of separate leases from the Green Canyon Block 18 lease. It is not entirely clear to the court from the LOWLA statute whether the theoretic Baker Hughes privilege would have attached only to the A5 Well, or to the entire Green Canyon Block 18 lease. Either way, the lien would attach only to a small portion of the debtor's total assets.

[16] A brief review of several of the proofs of claim filed by the LOWLA creditors whose claims were affected by the court's order granting Apollo's objection to claim (R.Doc. 526) shows that several of these creditors also had LOWLA liens specifically affecting the A5 Well, against which Baker Hughes could hypothetically have had a claim. *See e.g.* POC 17 and 40. There were numerous claims affecting the Green Canyon Block 18 lease.

Thus, at best, Baker Hughes would only have been partially secured in a hypothetical Chapter 7 case.  Because the payment from funds over which Baker Hughes did not hold a privilege would not have served to reduce the amount of the privilege or increase the debtor's equity in the collateral, the Trustee prevails as a matter of law in proving this element of his claim.

**B.  Section 547(c) Defenses**

Baker Hughes also raises defenses to the Trustee's claim.  These include a new value defense under § 547(c)(1), and an ordinary course of business defense under § 547(c)(2).  The defenses to § 547 must be proved by the defendant by a preponderance of the evidence.  *In re SGSM Acquisition Co., LLC,* 439 F.3d 233 (2006).

**1.  New Value**

Baker Hughes argues that the settlement payment was a contemporaneous exchange for new value within the meaning of § 547(c)(1).  Baker Hughes' argument is two-fold.  First, it asserts that when it released it LOWLA lien as part of the settlement agreement it provided new value.  Second, Baker Hughes argues that the $200,000 credit it gave to the debtor as part of the settlement agreement, as well as not reversing price discounts and charging the debtor interest pursuant to the settlement agreement also constitutes new value.

Section 547(c)(1) states:

> The trustee may not avoid under this section a transfer—
> (1) To the extent that such transfer was –
>     (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
>     (B) in fact a substantially contemporaneous exchange.

14

The Trustee argues that the payment to Baker Hughes does not fall under the new value exception of § 547(c)(1).

The payment at issue was made pursuant to the Settlement Agreement entered into between the debtor and Baker Hughes dated December 3, 2015.[17]  The Settlement Agreement concerns 14 invoices for work Baker Hughes performed for the debtor in connection with drilling the A5 Well.  The invoices range in date from June 17, 2015 to October 19, 2015.  As mentioned above, Baker Hughes produced a pup joint for use in the debtor's drilling operation, and it was the wrong size, which caused a delay in the debtor's operations.  The debtor informed Baker Hughes that it disputed the bills, and the parties entered into settlement negotiations, which were ultimately successful.

"New value," is defined in § 547(a)(2), as "money or money's worth and goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor under applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation."  Several courts have held that the creditor seeking an exception under § 547(c)(1) must establish that it provided the debtor with "something new that is of tangible value."  *Matter of Fuel Oil Supply & Terminaling, Inc.,* 837 F.2d 224, 230 (5th Cir. 1988); *In re Gulf Fleet Holdings, Inc.*, 485 B.R. 329 (Bankr.W.D.La. 2013); *In re Martin Wright Elec. Co.,* 2008 WL 114296 (Bankr.W.D.Tex.).

The court in *Gulf Fleet Holdings* declined to find that the release of a maritime lien constituted new value under § 547(c)(1), for a couple of reasons that are applicable here.  First,

---

[17]   The Settlement Agreement is found at Exhibit 1 to the Trustee's Motion for Summary Judgment, (R.Doc. 51-3).

the court found that the lien held by the creditor was outranked by a preferred mortgage, and so there was no value to which the lien could attach. As discussed above, there was a lack of equity in the A5 Well to which the Baker Hughes lien could have attached, so similar reasoning applies here. Second, *Gulf Fleet Holdings* held that even if enforceable lien rights existed, waiver or release of those rights does not constitute new value. This conclusion is supported by other courts. *In re 360Networks (USA) Inc.,* 327 B.R. 187, 193 (Bankr.S.D.N.Y. 2005)(release of a right to perfect a statutory lien does not constitute new value, citing cases); *In re Riggs,* 129 B.R. 494, 497 (Bankr.S.D.Ohio 1991)(forbearance from exercising a previously existing right is not "new value" within the meaning of § 547(c)(1)). This court finds these cases persuasive and holds that Baker Hughes' action under the Settlement Agreement in releasing its potential LOWLA claim against the debtor does not meet the requirements of § 547(c)(1).

The court next examines Baker Hughes' claim that the $200,000 credit it gave to the debtor as part of the settlement agreement constitutes new value. This argument misses the mark entirely. The settlement agreement was entered into because Baker Hughes provided the debtor with a pup joint that did not fit, causing the debtor several days of delay during its drilling operation. The debtor stopped paying Baker Hughes as a form of leverage to pressure Baker Hughes into making right its mistake. Baker Hughes and the debtor negotiated, and the Baker Hughes provided a credit to the debtor because it made a mistake. All of the work performed by Baker Hughes was completed prior to the filing of the involuntary bankruptcy petition, and the work covered by the invoices was performed prior to the confection of the settlement agreement. There was no new value given to the debtor in exchange for its payment. The credit reduced the amount owed on invoices for work already completed by Baker Hughes.

16

## 2. Ordinary Course of Business

Section 547(c)(2) states that the trustee may not avoid under this section a transfer:

> [T]o the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course or business or financial affairs of the debtor and the transferee, and such transfer was—
>
> (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
>
> (B) made according to ordinary business terms.[18]

"The ordinary course of business defense provides a safe haven for a creditor who continues to conduct normal business on normal terms." *In re Gulf City Seafoods*, 296 F.3d 363, 367 (5th Cir. 2002). A creditor asserting an ordinary course of business defense must prove the elements by a preponderance of the evidence. *Id.* Although the previous version of the Bankruptcy Code required a creditor to prove both prongs A and B of § 547(c)(2), the 2005 Bankruptcy Abuse Prevention and Consumer Protection Act changed the requirements so that the creditor claiming the ordinary course of business defense need only prove that the payments are made in the usual course of business between that creditor and the debtor, *or* that they are made in accordance with industry standards. Cases decided before the amendments can still be relevant as to a specific part of the test, but they were decided based on the law as it was at the time. Here, Baker Hughes argues that both prongs apply, so the court will address them separately.

### a. Section 547(c)(2)(A) or the "subjective test."

Subsection A requires the court to look to the course of dealings between the parties to determine whether the transaction was made in the ordinary course of their dealings with each

---

[18] The amendments to the Bankruptcy Code set forth in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") changed the requirements so that the creditor claiming the ordinary course of business defense need only prove that the payments are made in the usual course of business between that creditor and the debtor, *or* that they are made in accordance with industry standards, but because this case was filed prior to the BAPCPA amendments taking effect, the court looks at the Code and relevant caselaw pre-amendment.

other.  Here, Baker Hughes provided materials and services to the debtor for use in drilling the

A5 Well.  The debtor paid Baker Hughes for its work until Baker Hughes provided the wrong

pup joint to the debtor.  At that point the debtor stopped paying Baker Hughes, and the parties

entered into negotiations to reach an agreement.  Baker Hughes argues that the inquiry the court

must conduct is factual in nature, and therefore the court cannot grant summary judgment.  On

this point Baker Hughes cites *National Steel Corp. v. BSI Alloys, Inc.,* 351 B.R. 906 (N.D. Ill.

2006) where the parties could not agree as to what the terms of the settlement agreement were,

and the district court found there were not enough facts in the record to support the bankruptcy

court's granting of summary judgment.  Here, the parties have exhaustively briefed the issues

and submitted numerous exhibits, deposition transcripts, and other materials.  Baker Hughes

points to no actual material fact in dispute on this point, and the court cannot fathom what more

could be presented at trial on this issue.  Rather, it is a matter of reaching legal conclusions on

the facts presented.

Baker Hughes first argues that a pre-preference change in payment terms can be ordinary

course and cites numerous cases to support this argument.  The crux of the argument seems to be

that because the settlement agreement was reached *before* the 90-day preference period, and one

payment was made before the preference period, the other payment, which was made during the

preference period was made in the ordinary course of dealings between the parties.  Further,

Baker Hughes argues that the court need not look at the whole course of dealings between the

parties, because it can and should look only to payments made pursuant to the updated terms

reached in the agreement.  The problem with this argument is that the cases cited by Baker

Hughes are not quite on point as support for Baker Hughes' proposition.  *In re Kevco, Inc.,* 2006

18

WL 2037554 (N.D. Tex. 2006), aff'd 230 Fed. Appx. 466 (5th Cir. 2007); and *In re Sterry Indus.,* 553 B.R. 96 (Bankr.W.D.Tex. 2016) both considered time periods shorter than the entire course of dealings between the parties when determining whether the preference period actions were consistent with prior actions.  Both courts, however, specifically stated that the reason they were using shorter time periods was because one of the parties to the transactions had either changed control or ownership, and so the court was considering only the time period when the new ownership or control of the company was in effect.  This is not applicable in this case, as Baker Hughes does not allege that the debtor had a change of control or management leading to the enactment of the settlement agreement (with its change in payment terms) that is at issue here.

Baker Hughes cites *In re Xionics Imaging, Inc.,* 837 F.2d 763 (7th Cir. 1988) for its proposition that a modification of payment terms that occurs prior to the preference period *could* be within the ordinary course of the dealings between the parties.  *Xionics* contains a good description of the rationale for the ordinary course rule:

> The main purpose of the voidable-preference provision of the Bankruptcy Code is usually said to be to assure fair or equal treatment of creditors.  But as so often, the invocation of fairness and equality--vague terms that they are—conceals a practical consideration.  If there were no rule against preferences, an insolvent debtor, teetering on the edge of bankruptcy and besieged by creditors, might have an incentive to buy off the most importunate of his creditors, necessarily at the expense (the debtor being insolvent) of other creditors, in the hope of keeping afloat a little longer.[19]

Baker Hughes also argues that payments made pursuant to a restructuring agreement are protected from avoidance.  Baker Hughes is correct that several courts have held that payments made pursuant to a restructuring agreement are not *per se* outside of the ordinary course of

---

[19]  *Matter of Xionics Imaging,* 837 F.2d 763, 765 (7th Cir. 1988).

business as between the parties.[20]  That is not the same as holding that payments made pursuant

to a restructuring or settlement agreement *are* ordinary course.  Here, because the parties had a

several months long relationship before they entered into the settlement agreement, the court has

considered both the settlement agreement and the other dealings between the parties.

The exhibits provided by Baker Hughes contain numerous examples of emails and

deposition testimony showing that the main reason the debtor was so concerned with working

out a settlement with Baker Hughes is that the debtor needed Baker Hughes to provide further

services and knew that Baker Hughes would not provide further services unless it was paid for

the work it had already performed.  It is true that the debtor also sought a reduction in the amount

it owed Baker Hughes due to the problem with the pup joint, but there are numerous examples

---

[20]  *See e.g. In re Metromedia Fiber Network, Inc.,* 2005 WL 3789133 (Bankr.S.D.N.Y.), which quotes *In re Roblin Industries, Inc.,* 78 F.3d 30 (2nd Cir. 1996) and *I re Ice Cream Liquidation, Inc.,* 320 B.R. 242 (Bankr. D. Conn. 2005).  The discussion in *Metromedia* addresses the *Roblin* holding that payments made pursuant to a restructuring agreement are not *per se* outside the ordinary course of business when looking at an industry, and the extension of that in *dicta* by *Ice Cream Liquidation* that payments pursuant to a restructuring agreement is not *per se* outside the ordinary course of dealings between the parties.  *Ice Cream Liquidation,* however, relied on *Roblin,* and another case, *In re Kaypro,* 218 F.3d 1070 (9th Cir. 2000); these cases both only discussed the industry standard.  The third case relied on by *Ice Cream* Liquidation was *In re Magic Circle Energy Corp.,* 64 B.R. 269 (Bankr.W.D. Okla. 1986) a case in which the restructuring agreement between the parties had happened 19 months before the bankruptcy filing, and the debtor had been making regular monthly payments to the creditor for that entire period, and thus, the court found that these payments constituted ordinary course between the parties.  The *Metromedia* court also cites other cases that do not really apply to the situation before this court and therefore the court does not find them persuasive support for Baker Hughes' argument that the payment in question here should be protected from avoidance:  *In re Finn,* 909 F.2d 903 (6th Cir. 1990), holding that the holder of a debt incurred by a consumer taking out a loan for the first time is not *per se* excluded from the ordinary course defense; *In re US Office Products Co.,* 315 B.R. 37 (Bankr.D.Del. 2004) holding that a late payment in the context of a single transaction between the parties may fall within the ordinary course provision of § 547(c)(2)(B); then finding on the facts before it that the payment was late because work was not satisfactorily completed at the time the invoice was issued, but rather further work remained, and that once the work was properly completed prompt payment was made, thus, the payment was ordinary course between the parties; *Klevin v. Household Bank F.S.B.,* 334 F.3d 638 (7th Cir. 2003) holding that "[a]lthough a history of dealing between parties is certainly the strongest factor in supporting a determination that the business between a debtor and an alleged preferece creditor is ordinary, we do not believe it is necessary in every case"; *In re Air South Airlines,* 247 B.R. 165 (Bankr.D.S.C. 2000) declining to hold that a history of prior dealing is a sine qua non in order to afford a transferee the protections of § 547(c)(2).  Although this court is certainly not holding that a restructuring agreement or even a first time transaction as between the parties is *per se* outside the scope of the ordinary course defense under § 547(c)(2)(A), nothing in these cases has persuaded the court that it should look *only* to the settlement agreement between Baker Hughes and the debtor in this matter.

showing that the main motivation for the debtor making the payments to Baker Hughes was because the debtor was afraid it would be shut down if it failed to pay Baker Hughes.

Exhibits C82 and C84 are emails early in the relationship from Baker Hughes employees reminding the debtor that Baker Hughes cannot continue to perform work until the credit line is brought current. Although these do not directly reflect on the preference payments, they show that Baker Hughes is not shy about letting customers know that the consequence of non-payment is that more work will not be performed. Exhibit C85 is an internal Whistler email regarding some billing issues. Apparently, Baker Hughes had been sending invoices to the debtor's old address, and the debtor had not been receiving them. The email directs management at Whistler to solve these billing problems quickly, because otherwise, "we risk Baker not delivering completion equipment next week…." It further states: "There are no options to go to another vendor on the tangibles due to the lead time involved…" The reply to this email requests: "Please help with this matter as it is essential that operations not be disrupted with Baker on our wells." This discussion took place on June 4, 2015, again before the payment at issue, but shows that the debtor was very sensitive to pressure from Baker Hughes for payment.

Exhibit C92 reflects a discussion that took place on September 16, 2015 between the CEO of the debtor and an investor. This is around the time that the problem with the pup joint occurred, and the investor is asking if the debtor intends to replace Baker Hughes. The debtor's CEO replies that Baker Hughes is "the most aggressive about collection of any vendors."

Exhibits C77, C97 and C98 are emails dated October 9, 2015 between Baker Hughes and the debtor. They involve the debtor asking Baker Hughes to perform work, and Baker Hughes agreeing to do the work, but not until the debtor makes a payment of $980,000. Exhibit C99 is

an email dated October 11, 2015 from the debtor's CEO referencing a Baker Hughes credit

manager who is holding up the work because a wire payment did not go through.  Exhibit C101

shows that a wire transfer from the debtor to Baker Hughes was completed on October 13, 2015.

Exhibits C66, C122, C123, C124 and C125 are emails dated between November 13, 2015 and

November 20, 2015 between the debtor and Apollo discussing the debtor's financial

predicament.  They show that the debtor was making a list of which vendors it had to pay to

avoid being shut down.  Baker Hughes is on that list.[21]   The November 30, 2018 deposition of

Scott Frankel, the debtor's CEO, further supports this:

> Q.      Was there ever a discussion that you were a part of at Whistler to the
> effect of, "Whistler has this long list of vendors.  Let's prefer Baker Hughes to all
> those other vendors"?
> A.      There - - not in those words.  There were vendors that were more critical
> that were barking.  This would have been late '15, early '16.  And so we had a - -
> on an ongoing basis when we weren't - - when we didn't get the revenue and the
> money we were expecting to get where we were constantly deciding which
> vendors we needed to pay today and which ones we could try to hold off until
> tomorrow.
> Q.      And that was sort of a weekly meeting or a daily meeting?
> A.      It was daily.
> Q.      Okay.
> A.      It was daily.
> Q.      And then was there a - -  decision at Whistler to say, "Okay.  We are
> headed towards bankruptcy"?  Was that ever discussed?
> A.      No.  We - -  in fact, we never - -  bankruptcy never was an issue until
> March because Apollo always told us, "The money is coming.  The money is
> coming.  The money is coming."  And that's actually supported in their internal
> documents that we weren't privy to.
> Q.      It appears that Baker didn't work on the Erato well.  Was it Whistler's
> intention to use Baker at a subsequent phase in that well?
> A.      Possibly.

---

[21]   Exhibit 14 to the Trustee's Supplemental Motion for Summary Judgment (P-93), deposition of Scott Frankel
dated November 30, 2018 at pp. 33-34.

Even though there were other vendors more critical to the debtor's operations that were waiting

to get paid, the debtor chose to pay Baker Hughes, both because Baker Hughes was aggressive

and because the debtor might need Baker Hughes later and knew that Baker Hughes would not

perform if it was not paid.

Exhibit C61 is an email between Apollo personnel discussing unwinding hedges to pay

Baker Hughes.  It states:  "FYI I gave ok for whistler/Scott to unwind $1.5mm hedges to make

sure they have cash to pay Baker Hughes on Thursday.  Don't want another Miller or ENXP

involuntary!!"[22]

There is also evidence to show that the debtor was concerned about litigation with Baker

Hughes over the money owed to Baker Hughes.  The January 4, 2019 deposition of Jeffrey

Bartlett, the managing director of Apollo contains the following passage discussing a December

1, 2015 email from Bartlett to others at Apollo:

> Q.      In your email, you're describing a fax that Curtis received from Baker
> Hughes litigation group demanding full $3.5 million payment within five days; is
> that correct?
> A.      Right.
>
> ****
>
> Q.      Okay.  So at this point in time, were you aware that Baker Hughes and
> Whistler were entering into a settlement agreement?
> A.      No.
> Q.      Did you ever see a settlement agreement between the parties?
> A.      No.  I did not.
> Q.      But you're aware that Baker Hughes was threatening litigation.
> A.      Yes.[23]

---

[22]   Miller Energy Resources had an involuntary bankruptcy filed against it in August 2015, and Energy &
Exploration Partners, Inc. had an involuntary bankruptcy filed against it in November 2015.
[23]   Exhibit 15 to Trustee's Supplemental Motion for Summary Judgment (P-93), deposition of Scott Frankel dated
November 30, 2018 at pp. 106-107.

These emails and deposition transcripts show that what took place between the debtor and Baker Hughes is precisely what preference actions are meant to prevent.  One creditor using leverage over the debtor, either through threats of legal action or ceasing to perform, to get paid ahead of other creditors in the same position.  *See Xionics, supra.*

The court finds that Baker Hughes has not carried its burden of showing that the payments were ordinary course as between the parties.  Rather, the payments were the result of a settlement agreement confected to resolve the pup joint issue and stave off threats of work stoppage and/or litigation by Baker Hughes due to the debtor's precarious financial situation.

### b.   Section 547(c)(2)(B) or the "objective test."

Baker Hughes also asserts that it satisfies the second prong of § 547(c)(2), that the payments were made according to ordinary business terms.  This requires the court to examine the industry in which the debtor and creditor operate to determine what usual or ordinary business practices are in that industry.  Both the Trustee and Baker Hughes have presented expert opinions purporting to show what the ordinary terms in their industry might be, and this requires the court to make a factual determination as to which expert's report should be given more weight, among other things.  Because it is not appropriate for the court to make a determination as to which expert's opinion should be given more weight at the summary judgment phase, the Trustee's motion for summary judgment on this point is denied.

### V.   Conclusion

The parties have filed very lengthy briefs and submitted numerous exhibits, deposition transcripts, and expert reports.  Because there is ample evidence in the record, and because the basic facts underlying this dispute are not really in question, the court grants summary judgment

to the Trustee on all of the § 547(b) factors except for § 547(b)(3). The court cannot make a determination at the summary judgment phase as to which expert report should be given more weight, so that is an issue for trial. Similarly, there are not really any factual disputes as to the defenses raised by Baker Hughes, and the court rejects the § 547(c)(1) and the § 547(c)(2)(A) defenses. Because, however, there are also conflicting expert reports affecting the § 547(c)(2(B) defense as to what might be ordinary in the industry, and the court cannot make a determination as to which expert's report should be given more weight at this stage, this is also an issue for trial. A separate order will be entered.

New Orleans, Louisiana, October 10, 2019.

Jerry A. Brown
U.S. Bankruptcy Judge